
Minute Order Form (06/97)

154

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6410 | **DATE** | 3/22/2004 |
| **CASE TITLE** | Vernice M. Dixon vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Enter memorandum opinion and order. Defendant's motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | 2 |
| ✓ | Notices mailed by judge's staff. | number of notices |
| | Notified counsel by telephone. | MAR 2 3 2004 |
| | Docketing to mail notices. | date docketed |
| ✓ | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | 3/22/2004 |
| | | date mailed notice |
| IS | courtroom deputy's initials | IS |
| | | mailing deputy initials |

U.S. DISTRICT COURT CLERK

Date/time received in central Clerk's Office

Document Number

30

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| VERNICE M. DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 6410 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED

MAR 2 3 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff, Vernice M. Dixon, seeks judicial review of the final decision of Defendant,

Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("Commissioner"),

who determined that Plaintiff was not entitled to Supplemental Security Income ("SSI"), pursuant

to 42 U.S.C. § 405(g). Before this Court is Plaintiff's Motion for Summary Judgment, which

requests this Court to reverse the Administrative Law Judge's ("ALJ") decision that Plaintiff was

not entitled to SSI, or alternatively, to remand Plaintiff's case for further determination of her

disability. The Commissioner's Motion for Summary Judgment, which requests this Court to

affirm the ALJ's decision, is also before the Court. For the reasons set forth below, this Court

affirms the ALJ's decision.

## I.   Procedural History

Plaintiff applied for SSI on September 30, 1999. (R. at 90-92.) She claimed disability

due to a hand injury that occurred August 18, 1980, as well as depression and seizures, which

began roughly eighteen months prior to the application. (R. at 66.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 62, 67.) Plaintiff requested a hearing before an ALJ on June 15, 2000. (R. at 70.) The hearing was held before ALJ Cynthia M. Bretthauer on September 11, 2000, where Plaintiff, who was represented by counsel, Plaintiff's daughter, and a vocational expert testified. (R. at 15.) On December 27, 2000, the ALJ rendered her decision and found Plaintiff not disabled because she could perform a significant number of jobs in the national economy. (R. at 20.) Plaintiff filed a timely appeal, but the Appeals Council denied the request for review. (R. at 6-7.) Plaintiff now seeks judicial review of that decision.

## II.    Background Facts

### A.    Plaintiff's Background

Plaintiff was born on September 7, 1953, and was forty-seven years old at the time of the ALJ's decision. (R. at 19-20.) She graduated from high school, completed one year of college, and possesses a vocational certificate for stenography. (R. at 28.) The Plaintiff has worked as a circulating clerk at a college, a cashier at a gas station, a line supervisor for the CHA, and most recently as a bus supervisor for a college summer program. (R. at 102.) This most recent employment ended at the close of the summer of 1996. (Id.)

### B.    Medical Evidence

In connection with a previous application for benefits, Plaintiff was examined by Dr. Steven Radowitz on October 19, 1998. (R. at 176.) Dr. Radowitz observed that Plaintiff had suffered a traumatic injury to her right hand when it went through a window in 1980. (Id.) The injury consisted of severe arterial, venous, tendon and nerve damage, which required initial

surgery in 1980, and a surgical revision of tendon damage in 1983. (Id.) Plaintiff was diagnosed with weakness, numbness, and pain in her right hand. (Id.)

Dr. Radowitz tested Plaintiff's grip strength and determined that the right hand grip strength ranged between 0 and 1/5. (R. at 178.) Dr. Radowitz also noted that Plaintiff appeared to have limited motion in the wrist and MCP joints, as well as difficulty manipulating small objects. (Id.) Based on these initial observations, Dr. Radowitz ordered x-rays of the right hand and wrist. (Id.) The x-rays revealed mild osteopenia, or a decrease in bone mass, and degenerative change with narrowing of the radial carpal joint. (R. at 180.)

Based on Dr. Radowitz's findings, on October 29, 1998, Dr. Earl Donelan filed a Residual Functioning Capacity Evaluation ("RFC"). (R. at 181-88.) Dr. Donelan determined that Plaintiff could lift twenty pounds with her right arm occasionally, and ten pounds with her right arm frequently. (R. at 182.) Dr. Donelan also observed that Plaintiff could stand and/or walk, or sit, with normal breaks, for a total of six hours in an eight hour workday. (Id.) Dr. Donelan did not observe any push/pull, postural, visual, communicative, or environmental limitations. (R. at 182-85.) However, Dr. Donelan did note manipulative limitations on the right hand and wrist in keeping with Dr. Radowitz's diagnosis. (R. at 184, 188.) The prior application for Supplemental Security Income was denied on December 8, 1998. (R. at 58-61.)

Between January, 1999, and July, 2000, Plaintiff visited the West Chicago Physicians Association ("WCPA") for treatment. On January 29, 1999, Plaintiff was diagnosed with depression, obesity and status-post right hand injury. (R. at 268.) The physician's notes indicate that Plaintiff previously had been prescribed Paxil, but had stopped taking it because it made her

"feel funny." (Id.) As a result, the physician prescribed Elavil for both depression and neuropathy in the right hand. (Id.)

Between February and May, 1999, Plaintiff had three check-ups. (R. at 265-67.) These check-ups reiterate the main diagnosis of depression, obesity and status-post injury to the right hand. (Id.) Plaintiff was advised to continue on Elavil, and the dosage was raised from 25mg to 50mg on April 30, 1998. (R. at 266.)

On July 13, 1999, Plaintiff presented with a subconjunctive hemorrhage in her right eye. (R. at 264.) She was referred to Dr. Norman Lewis for an opthamology consult. (R. at 310.) Prior to the consult, Plaintiff returned to the WCPA, on July 23, 1999. (R. at 263.) The treating physician noted that the hemorrhaged eye was "much better." (Id.) The physician also noted that Plaintiff had stopped taking Elavil. (Id.) She was advised to go back on Elavil at the most recent prescribed amount of 50mg. (Id.)

When Plaintiff saw Dr. Lewis on August 8, 1999, the specific symptoms of the hemorrhage had subsided. (R. at 310.) Dr. Lewis, however, expressed concern over Plaintiff's claim that she saw jagged lines with associated nausea and dizziness, and included his concerns in a memo to Dr. Gulati, who was scheduled to see Plaintiff on August 16, 1999. (Id.) Dr. Lewis also noted in this memo that Plaintiff "does not note any associated headache." (Id.) Dr. Lewis opined to Dr. Gulati that the visual phenomena may be a variation of migraine headaches, and therefore warranted further study. (Id.)

In August-November, 1999, Plaintiff visited Dr. Anil Gulati on several occasions in connection with the evidence of possible migraines Dr. Lewis discovered. (R. at 212-19.) Plaintiff complained to Dr. Gulati of problems with her eyesight and headaches. (R. at 213.)

- 4 -

Dr. Gulati noted that Plaintiff experienced headaches one or two times a month, and that Plaintiff sometimes experienced visual impairment, dizziness, and nausea in connection with the headaches. (R. at 218.) As a result of his findings, Dr. Gulati diagnosed a "likely migraine variant" and ordered a CT scan of Plaintiff's head. (R. at 219.) The CT scan revealed a mild asymmetry of the temporalis muscles, with the left larger than the right, but also noted that such a finding is nonspecific. (R. at 215.) Aside from this nonspecific finding the CT scan was "unremarkable." (R. at 216.)

On August 13, 1999, Plaintiff again visited the WCPA to follow up on the hemorrhaged right eye. (R. at 262.) The treating physician diagnosed injury of the right hand with neuropathy and deformity in same hand. (Id.) The physician also recommended that the Plaintiff begin on Neurontin. (Id.) The report does not mention obesity, depression or Elavil.

On October 26, 1999, Plaintiff presented with stomach pains. (R. at 296.) The physician's notes indicate that Plaintiff had been hospitalized at Rush Memorial with abdominal pain and was found to have gallstones. (Id.) Plaintiff was also again diagnosed with atypical migraines. (Id.) The treating physician prescribed Pepcid and Depakote. (Id.)

Beginning in January, 2000, Plaintiff's physicians began to focus more on her headaches. Between January 21 and July 21, 2000, Plaintiff visited the WCPA on seven occasions. (R. at 289-95.) The first of these visits noted the possibility of seizures. (R. at 295.) Over the course of these visits various other complaints or disorders were noted, including: anemia, hyperlipidemia (elevated concentrations of lipids in the plasma), anxiety disorder, sinusitis, and a cough. (R. at 289-95.) On February 29, 2000, Plaintiff's primary physician, Dr. James Miller,

ordered a MRI of the brain. (R. at 293.) The MRI was performed by the Mt. Sinai Medical Group on April 5, 2000, and was negative. (R. at 276.)

On February 16, 2000, Dr. David Gehlhoff administered a psychiatric evaluation of Plaintiff. (R. at 220.) The report notes that according to Plaintiff her seizures had begun a year previously and occurred only in her sleep. (Id.) Plaintiff also described the nature and onset of her depression. (Id.) She told the doctor that her depression began around the time of her mother's death, that she was not suicidal, and that she still can get some enjoyment out of things. (Id.) Dr. Gehlhoff performed several tests on Plaintiff's memory and judgment. (R. at 221-22.) Dr. Gehlhoff noted that Plaintiff's affect was "blunted and restricted," and that "she appeared sad." (R. at 221.) Based on these evaluations Dr. Gehlhoff opined that Plaintiff should not handle her own funds. (R. at 222.) Dr. Gehlhoff diagnosed alcohol use in remission, seizure disorder, amnestic disorder, NOS, and dysthymic disorder. (Id.)

On February 16, 2000, Plaintiff was also examined by Dr. Hilton Gordon, a consultative internist, for her seizure disorder and right hand problems. (R. at 223.) Dr. Gordon diagnosed seizure disorder of unknown etiology, history of gallstones, and history of headaches. (R. at 225.) Dr. Gordon performed a specific examination of Plaintiff's right hand. (Id.) Dr. Gordon observed full extension of the fingers without difficulty, but the inability to completely flex them. (Id.) Plaintiff demonstrated fist and grip strength of 3/5 in the right hand with pain, and 5/5 in the left hand. (Id.) Dr. Gordon also noted 3/5 motor strength in the right upper limb, and 5/5 in all other muscles. (Id.) Dr. Gordon observed that Plaintiff could hold a pen, and zip and button slowly with the right hand. (Id.) Based on these findings, Dr. Gordon diagnosed Plaintiff with

"status post laceration of the right arm with decreased flexion of the fingers and wrist associated with pain." (Id.)

March 23, 2000, Dr. Carl Hermsmeyer, Ph.D., performed a Psychiatric Review Technique ("PRT"), (R. at 240-48), and a mental RFC assessment, (R. at 249-52). From the PRT Dr. Hermsmeyer determined that Plaintiff's amnestic disorder, NOS did not meet the listing requirements for organic mental disorder. (R. at 242; 20 C.F.R. Part 404, subpart P, app. 1, § 12.02.) He determined that Plaintiff's dysthymia did not to meet the listing requirements for affective disorders. (R. at 243; 20 C.F.R. Part 404, subpart P, app. 1, § 12.04.) Dr. Hermsmeyer determined that Plaintiff's substance addiction disorder was "in remission." (R. at 246; 20 C.F.R. Part 404, subpart P, app. 1, § 12.09.) Because no listings were met, Dr. Hermsmeyer asserted on the PRT form that a mental RFC assessment was necessary. (R. at 240.) On the mental RFC assessment form, Dr. Hermsmeyer indicated two areas of moderate limitation: the ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. (R. at 249.) Dr. Hermsmeyer noted a history of substance abuse disorder, amnestic disorder, NOS, and dysthymia. (R. at 251.) He concluded that Plaintiff possessed the mental capacity to perform simple tasks. (Id.)

March 30, 2000, Dr. E.C. Bone performed a physical RFC assessment. (R. at 232-39.) Dr. Bone entered a primary diagnosis of decreased function of the right hand secondary to trauma, a secondary diagnosis of seizure disorder, and listed tension headaches under other alleged impairments. (R. at 232.) Dr. Bone determined that Plaintiff could lift twenty pounds occasionally, and ten pounds frequently, due to her inability to lift, push or pull more than ten pounds without pain in her right hand. (R. at 233.) Dr. Bone also determined that Plaintiff could

stand and/or walk, or sit, for about six hours, with normal breaks, in an eight hour workday. (Id.)
Dr. Bone noted that Plaintiff's ability to lift or pull would be limited in the upper extremities due
to her inability to flex the fingers of her right hand, or completely flex or extend the right wrist.
(Id.) Due to the hand injury, Dr. Bone also noted manipulation limitations for that hand in
handling, fingering and feeling. (R. at 235.) In connection to the seizure disorder, Dr. Bone
indicated a postural limitation for climbing ladders, ropes and scaffolds. (R. at 234.) Dr. Bone
also indicated that Plaintiff should not work around machinery with open, moving parts, or in
unprotected heights, due to the seizure disorder. (R. at 236.) No visual or communicative
limitations were indicated. (R. at 235-36.)

On May 23, 2000, Plaintiff's primary physician, Dr. Miller, filed a Report of Incapacity
with the Illinois Department of Human Services. (R. at 118-23.) Dr. Miller noted full capacity
or near full capacity in finger dexterity of both hands, fine manipulations, gross manipulations,
standing, turning, sitting and speaking. (R. at 121.) He noted an up to twenty percent reduced
capacity in walking, bending, stooping, climbing and pushing, and a twenty to fifty percent
reduced capacity in pulling. (Id.) Dr. Miller rated Plaintiff an "A" on a scale of "A" to "E" for
her ability to perform the physical activities of daily living. (Id.) He also indicated that Plaintiff
could lift twenty pounds repeatedly over an eight hour day, five days a week. (Id.) In regards to
mental functioning, Dr. Miller observed that Plaintiff is often sad and anxious. (Id.) He also
indicated a twenty to fifty percent reduction in the activities of daily living, social functioning
and concentration. (Id.)

Just prior to the Oral Hearing on September 11, 2000, Plaintiff visited Dr. Bindu Desai, a
neurologist at Mt. Sinai Medical Group, in connection with her headaches and seizure disorder.

- 8 -

(R. at 276.) Dr. Desai noted an abnormal EEG from February, 2000, but also noted that the subsequent MRI in April, 2000, was negative. (R. at 276; 307.) Dr. Desai diagnosed chronic severe headaches with elements of migraine and elements of tension. (R. at 278.) Dr. Desai also indicated that Plaintiff should be given a psychiatric consult in order to address and treat her depression. (Id.)

### C.     Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that her hand bothered her a great deal in cold weather, and for this reason her most recent jobs had only been for the summer. (R. at 29.) Plaintiff also testified that she lacks full feeling in her right hand. (R. at 31.) In addition, Plaintiff claimed that the pain in her right hand is constant. (R. at 35.) She added that the medication she takes for her hand does not alleviate the pain significantly, and not at all if it rains. (R. at 36.) Plaintiff also testified that she had recently been referred to a psychiatrist for depression. (R. at 32.) She had not sought psychiatric treatment previously, despite her lingering depression, due to a belief that she could only go if referred. (Id.) Plaintiff did admit, however, that she had taken various anti-depressants at different times, which had been prescribed by her primary physician. (R. at 31-32.) Plaintiff also testified that her head hurts "all the time," but with some days worse than others. (R. at 35.) She indicated that the medication she takes for her headaches only works occasionally, and the medication's effectiveness drops as the severity of the headache rises. (Id.) The most severe headaches occur once a week and last from hours to days. (R. at 36.) Plaintiff also testified that she experiences nocturnal seizures three or four

times a year. (Id.) After a seizure, Plaintiff feels weak and suffers a headache and hemorrhages in her eyes. (R. at 37.) She has broken her teeth a few times also. (Id.)

Plaintiff testified that she has no difficulty walking, standing or sitting, but she also stated that when she suffers from a more severe headache she is completely incapacitated. (R. at 37-38.) Plaintiff was unable to quantify her own ability to lift, because her daughter lifts things for her. (R. at 38.) Plaintiff also offered that she is unable to hold or manipulate objects with her right hand, though she is capable of such things with her left hand. (Id.) As a result of these limitations, Plaintiff testified that her daughter did the dishes, and along with her son, most of the other household chores. (R. at 38-40.) Plaintiff did admit to being able to do some light cleaning, make the bed, and bathe and dress herself. (R. at 40.) Plaintiff also testified that she has no hobbies, rarely goes out unless her children help her, and most days remains at home and watches television. (R. at 41.)

### D.  Plaintiff's Daughter's Testimony

Plaintiff's daughter testified that when her mother suffers a severe headache she is only able to lie completely still with the lights and television off. (R. at 45.) During these episodes, her children have to help her to the bathroom and bring her food and "make her eat." (Id.) Plaintiff's daughter also testified that she or her brother almost always accompany her to the doctor because her mother gets confused very easily. (R. at 46.) Plaintiff's daughter also testified that her mother suffers severe headaches once a week, and the headaches last for hours or days. (Id.) Plaintiff's daughter also testified that she had witnessed one of her mother's nocturnal seizures, which involved a lack of responsiveness, shaking, and teeth chattering. (R. at 46-47.)

- 10 -

According to the daughter, these seizures occur every few months, or three to four times a year. (R. at 47.)

### E.     Vocational Expert's Testimony

Lee Knuton, a vocational expert ("VE") also testified at the hearing. (R. at 48-53.) He was asked whether jobs would be available to an individual with Plaintiff's age, education, and work experience, with these limitations: sit for six hours, stand and walk for six hours, lift and carry frequently ten pounds, occasionally up to twenty pounds, no repetitive pushing or pulling with the right arm, no repetitive grasping or fine manipulation with the right hand, only occasional crawling, no climbing, no exposure to unprotected heights, no exposure to hazardous machinery, and with the final limitation of only simple and routine jobs. (R. at 48.) The VE was then asked whether such an individual could perform any of the Plaintiff's past jobs. (Id.) The VE answered that such an individual could perform as a cashier, but not as a youth supervisor or bus monitor. (R. at 49.) The VE noted that such an individual could additionally work as a general clerk and helper, an unskilled window clerk, a car-wash attendant, a school guard, a crossing guard, and an usher. (Id.) The ALJ then asked the VE if such jobs would still be available if she added the restriction of no exposure to cold. (Id.) The VE eliminated the car-wash attendant, crossing guard and school guard from the pool. (R. at 50.) The ALJ then extended the hypothetical to allow only for occasional grasping and fine manipulation. (Id.) The VE eliminated the position of cashier from the pool. (Id.) The ALJ then asked the VE whether if one were to assume that all of Plaintiff's statements were true for this hypothetical individual, any jobs would remain. (Id.) The VE responded, no, the headaches, seizures and loss of

concentration would render such an individual incapable of working a full workday or

workweek.  (R. at 50-51.)

### III.   ALJ's Findings

The ALJ made the following specific findings:

1.   The claimant has not engaged in substantial gainful activity since at least September 30, 1999.

2.   The medical evidence establishes the claimant has severe headaches, a seizure disorder, history of right upper extremity laceration, and depression, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3.   The claimant's objective complaints are found to be not entirely credible.

4.   The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for more than light exertion, with no repetitive pushing/pulling with the right upper extremity, no repeated fine manipulations with the right hand, no more than occasional crawling, no work on ladders/ropes/scaffolds, avoidance of even moderate exposure to unprotected heights or moving/hazardous machinery, avoidance of concentrated exposure to cold temperatures, and no more than simple routine tasks (20 CFR 416.945).

5.   The claimant is unable to perform her past relevant work as a supervisor (with children) or classroom/bus monitor.  The claimant is able to do her past work as a cashier but this job was not performed for a period long enough to be considered relevant.

6.   The claimant's residual functional capacity for the full range of light work is reduced by the above-cited limitations.

7.   The claimant is forty-seven years old, which is defined as a younger individual (20 CFR 416.963).

8.   The claimant completed high school and one year of college (20 CFR 416.964).

9. The claimant does not have any acquired work skills that are transferable to the skilled or semiskilled work functions of other work (20 CFR 416.968).

10. Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 416.969 of Regulations No. 16 and Rule 202.20, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11. Although the claimant's additional nonexertional limitations do not allow her to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which she could perform. Examples of such jobs are: Clerk/helper (25,000), sales/rental clerk (25,000), usher (1,000), and maid/cleaners (6,000). These jobs, identified by a vocational expert as existing in the cited numbers in the Chicago area, are found to exist in significant numbers in the regional economy and, therefore, the national economy.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(f)).

## IV. Discussion

In order to qualify for payment of Supplemental Security Income an individual must meet the statutory standard for disability, which requires the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that has lasted or can be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). The determination of disability involves a five-step process that considers both medical and vocational factors. The five steps are:

Step 1: Is the claimant presently employed? If yes, the claim is disallowed; if no, the inquiry proceeds to step two.
Step 2: Is the claimant's impairment "severe," and expected to last at least 12 months? If no, the claim is disallowed; if yes, the inquiry proceeds to step three.

Step 3: Does the impairment meet or exceed one of a list of specific impairments? If yes, the claimant is automatically disabled; if no, the inquiry proceeds to step four.

Step 4: Is the claimant able to perform her past relevant work experience? If yes, the claim is denied; if no, the inquiry proceeds to step five where the burden shifts to the Commissioner.

Step 5: Is the claimant able to perform any other work within his residual functional capacity in the national economy? If yes, the claim is denied; if no the claimant is disabled.

*See generally* 20 C.F.R. § 404.1520; *Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994).

The ALJ used this five-step process in making her findings, and determined that Plaintiff was not disabled at step five. (R. at 19-20.) Relying on Plaintiff's RFC assessment and the vocational expert's testimony, the ALJ determined that Plaintiff was able to perform work existing in significant number in the national economy and therefore was not disabled. (Id.)

Section 205(g) of the Social Security Act grants federal courts the authority to review final decisions of the Commissioner with the power to affirm, modify, or reverse, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). However, the scope of review this Court must use is quite limited; the Commissioner's decision must be affirmed so long as it is supported by substantial evidence. *See Herron*, 19 F.3d at 333.

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . .'" *Dray v. R.R. Ret. Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ's finding must be supported by more than a scintilla of evidence, but may be supported by less than the full weight of the evidence. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986). The reviewing court must consider all

- 14 -

evidence on the record; however, it may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ, because the ALJ must resolve all factual issues and evidentiary conflicts. *Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir. 1993); *Delgado*, 782 F.2d at 82. Therefore, the critical question for this Court is not whether Plaintiff was disabled but whether there is substantial evidence in the record to support the Commissioner's decision. If reasonable minds could disagree on whether Plaintiff is disabled, we must affirm the ALJ's decision denying benefits. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

Plaintiff contests the ALJ's decision that she was not disabled on two primary grounds. First, Plaintiff contends that the ALJ erred when she determined Plaintiff's RFC because the ALJ failed to give proper consideration to certain physical and mental factors. Specifically, Plaintiff argues that the ALJ failed to build the required logical bridge from Plaintiff's ailments to the RFC determination on three fronts: the ALJ failed to state logical reasons for rejecting certain medical evidence of Plaintiff's physical impairments, the ALJ failed to address Plaintiff's obesity, and the ALJ failed to perform a proper mental RFC assessment. Second, Plaintiff contends that the ALJ incorrectly disregarded Plaintiff's testimony about her impairments when the ALJ determined that Plaintiff's testimony lacked credibility. Each of these arguments will be addressed in turn.

A.      **The ALJ did not Err when She Determined Plaintiff's RFC Because the ALJ Relied upon Substantial Evidence that Supported the Ultimate RFC Determination.**

Plaintiff argues that the ALJ failed to address certain assessments of Plaintiff's right hand, and misstated the findings of certain assessments that were addressed. Plaintiff also contends that the ALJ failed to consider Plaintiff's obesity as a part of her RFC determination, which then

resulted in an insufficient RFC determination. Plaintiff further argues that the RFC

determination was insufficient because the ALJ failed to reduce Plaintiff's mental impairments to

a proper mental RFC assessment. Plaintiff contends that these failures demonstrate that the ALJ

failed to build a logical bridge between Plaintiff's impairments, and the RFC determination. The

record indicates, however, that the ALJ took into account the full weight of the medical record,

adequately addressed Plaintiff's obesity and mental impairments, and constructed a sufficient

logical bridge between Plaintiff's impairments and the final RFC determination.

1.   The ALJ Adequately Addressed all Relevant Assessments
     of Plaintiff's Right Hand and did not Misstate the Findings
     of any Assessment.

Plaintiff argues that the ALJ did not adequately address each of the numerous

examinations of Plaintiff's right hand, and misstated the findings of one particular assessment of

Plaintiff's right hand. As a result, Plaintiff contends, the ALJ's determination that Plaintiff

possesses the RFC necessary to perform light unskilled work with certain specified limitations

was erroneous. (R. at 18.) As support for her argument, Plaintiff points to the assessments

performed by Drs. Radowitz and Gordon. Dr. Radowitz examined Plaintiff's hand on

October 19, 1998, and determined that Plaintiff suffered from weakness, numbness and pain in

her right hand. (R. at 176.) Dr. Radowitz also noted that Plaintiff only manipulated small

objects with difficulty, demonstrated limited motion in the right wrist and MCP joints, and

presented a right hand grip strength between 0 and 1/5. (R. at 178.) Dr. Gordon examined

Plaintiff on February 16, 2000, and observed full extension of the fingers of the right hand, but

an inability to flex them. (R. at 225.) Dr. Gordon also found fist and grip strength of 3/5 in the

right hand with pain, and noted that Plaintiff could hold a pen, and zip and button slowly with the right hand. (Id.) Plaintiff's argument on this point relies on two perceived omissions. First, Plaintiff contends that the ALJ did not consider the fact that Dr. Gordon added "with pain" to the assessment of Plaintiff's grip strength. Second, Plaintiff contends that the ALJ did not explain why she chose not to rely on Dr. Radowitz's 1998 assessment. These omissions, according to Plaintiff, resulted in an inadequate RFC determination.

The purpose of the RFC determination is to quantify what manner of activity a claimant can still perform despite physical impairments. 20 C.F.R. § 404.1545(a). Thus, the RFC determination is ultimately used to determine a claimant's ability to work. 20 C.F.R. § 404.1545(b). The ALJ is responsible for examining and weighing the evidence of physical limitations and then determining the appropriate RFC determination. 20 C.F.R. § 404.1527(e)(1)-(2); *Clifford v. Apfel*, 227 F.3d 863, 872-73 (7th Cir. 2000). Thus, the ALJ must always support her conclusions with medical evidence from the record. Furthermore, the ALJ must "minimally articulate" the reasons for crediting or rejecting certain lines of evidence. *Clifford*, 227 F.3d at 870 (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). The ALJ also must never substitute her own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *Clifford*, 227 F.3d at 870; *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996).

In this case, the ALJ determined that Plaintiff could still perform light unskilled work with numerous additional limitations. (R. at 18.) Those additional limitations included several obviously intended to accommodate Plaintiff's right hand: only able to lift and carry up to ten pounds frequently and up to twenty pounds occasionally, unable to push or pull repeatedly with

the right arm, no fine manipulations with the right hand, no concentrated exposure to cold temperatures. (R. at 17-18.) In support of this determination, the ALJ cited to Dr. Gordon's assessment, as well as to Plaintiff's treating physician, Dr. Miller. (R. at 18.) The ALJ mentions neither Dr. Gordon's notation of "with pain," nor Dr. Radowitz's report for direct support. Plaintiff's argument on this front relies largely upon that omission.

As to the failure to mention Dr. Gordon's own notation of pain in connection with the grip test, we find that omission insignificant. The fact that the ALJ did not mention a minor notation in one of many medical assessments does not indicate a rejection of medical evidence, such that the ALJ would be required to articulate an explicit reason for not considering it. Indeed, the ALJ's decision makes explicit reference to Plaintiff's pain in both the right hand and wrist. (R. at 16.) Additionally, the fact that the ALJ set numerous limitations on the RFC determination that reflected Plaintiff's limited use of her right hand indicates the ALJ did not ignore medical evidence of Plaintiff's hand pain. Particularly instructive is the ALJ's limitation of no concentrated exposure to cold temperatures, which would appear to be directed exclusively at Plaintiff's complaint that cold temperatures increased the discomfort in her hand. Thus, the ALJ's decision does not indicate that she ignored the fact that Plaintiff experiences pain in her right hand under certain circumstances.

Plaintiff also contends that the ALJ failed to provide a logical explanation for not relying on Dr. Radowitz's assessment. Plaintiff admits that the ALJ explicitly recognized Dr. Radowitz's findings, but then alleges that the ALJ failed to provide the logic used in ignoring Dr. Radowitz's findings. There is nothing in the ALJ's decision, however, to indicate that the ALJ ignored Dr. Radowitz's findings. The ALJ's decision recites a detailed account of Dr. Radowitz's

findings. (R. at 15-16.) It is true, however, that the ALJ relied primarily on the reports of

Drs. Gordon and Miller to determine the relevant limitations on Plaintiff's right upper extremity.

(R. at 18.) Defendant contends, in part, that the ALJ was correct not to rely on Dr. Radowitz's

report, because it related to a previous SSI application that was denied. Plaintiff counters that the

report is still relevant as evidence of the longitudinal history of Plaintiff's right hand impairment.

*See* 20 C.F.R. § 416.994(b)(2)(iv)(D) (noting that temporary improvements do not warrant a

finding of medical improvement); SSR 96-7p. We agree that the report is relevant as evidence

necessary to develop the history of this impairment. In addition, the fact that the report was

produced in connection to a previous application does not impose any real limitation on the

ALJ's discretion to refer to that report. We disagree, however, with Plaintiff's contention that the

ALJ's decision to rely primarily on the reports of Drs. Gordon and Miller rendered the ultimate

RFC determination inadequate.

Dr. Radowtiz's assessment of Plaintiff's right hand paints a bleaker picture than that

provided by Dr. Gordon. More specifically, Dr. Radowitz found grip strength of 0 to 1/5, and

Dr. Gordon found grip strength of 3/5. Dr. Radowitz also noted an inability to manipulate

objects. (R. at 178.) Dr. Gordon indicated a severely reduced ability to manipulate objects, and

that only slowly and with pain. (R. at 225.) The other aspects of these two assessments,

however, are largely consistent. Both physicians noted pain in the use of that hand and limited

flexibility in the wrist and fingers. Most significantly, however, Dr. Gordon's report was the

most recent available on Plaintiff's right hand and arm. In addition, the ALJ did not rely

exclusively on Dr. Gordon's report, but also referred to her treating physician's report. Plaintiff's

treating physician, Dr. Miller, observed full or near full capacity in finger dexterity, fine

manipulations and gross manipulations. (R. at 121.) Dr. Miller also recorded Plaintiff's ability to

perform the physical activities of daily living as an "A" on a scale of A to E. (Id.) Dr. Miller

also believed that Plaintiff could repeatedly lift twenty pounds during an eight hour day five days

a week. (Id.) This report, perhaps slightly more optimistic than either Dr. Gordon's or

Dr. Radowitz's, occurred in May, 2000, three months after Dr. Gordon's assessment. We find

that the ALJ's decision to rely primarily on the reports of Dr. Gordon and Dr. Miller was logically

supported by the fact that those reports were the most recent available on Plaintiff's right hand.

In addition, we find that the determination to rely on Dr. Miller's report as a supplement to

Dr. Gordon's was appropriate given that Dr. Miller was Plaintiff's treating physician, and this

assessment was not inconsistent with other medical evidence. *See Whitney v. Schweiker*, 695

F.2d 784, 789 (7th Cir. 1982) (a treating physician's evidence, if credible, should be given

controlling weight in the absence of evidence to the contrary); 20 C.F.R. § 404.1527(d)(2). We

also find that the ALJ's decision reveals that she incorporated previous diagnoses that were far

more negative than Dr. Miller's in the ultimate RFC determination.

As Plaintiff indicates, the significance of Dr. Radowitz's report is its ability to provide a

deeper record of Plaintiff's right hand problems. Thus, this report stands alongside other medical

reports to present a more complete picture of Plaintiff's impairments over time. In short, earlier

assessments explicitly referred to by the ALJ, such as Dr. Radowitz's report, function as

additional supplements to the more recent findings undertaken explicitly for the present

application. The ALJ's final determination that Plaintiff's right hand should be restricted to no

repeated pushing or pulling, nothing more than simple grasping, and no repeated fine

manipulations, indicates a reliance on these more recent assessments as supplemented by earlier

assessments. This conclusion is supported by the fact that the ultimate RFC determination places greater limitations on right hand activity than Dr. Miller's report found necessary. In support of the RFC determination, the ALJ cited to the "objective medical evidence of record." (R. at 18.) Included in that evidence were the earlier medical assessments, including Dr. Radowitz's. Though the ALJ only explicitly mentioned data from the most recent assessments of Drs. Gordon and Miller when supporting the RFC determination, the actual limitations set forth in the RFC determination indicate a reliance on the whole of the "objective medical evidence of record." (Id.) Therefore, the ALJ's decision to limit Plaintiff's RFC determination to simple grasping and no repeated fine manipulations was based upon a logical and accurate interpretation of the available medical evidence.

2.    The ALJ's RFC Determination Reflects an Adequate
Consideration of the Available Medical Evidence of
Plaintiff's Obesity.

Plaintiff alleges that the ALJ failed to consider Plaintiff's obesity as part of the RFC determination "as is required by SSR 00-3p." (Pl.'s Br. at 16.) Obesity is not a listing level impairment, but the effects of obesity must be taken into account in the analysis of other demonstrable impairments. 20 C.F.R. § 404.1523 (ALJ must consider the combined effect of all of the claimant's ailments regardless of whether such impairment would be sufficiently severe if considered on its own). Therefore, these rules and reminders simply reaffirm the general principle that when determining an individual's RFC, the adjudicator must consider all impairments which might limit that individual's ability to function. 20 C.F.R. § 404.1527(e)(1)-(2); *Cichon v. Barnhart*, 222 F. Supp. 2d 1019, 1027-28 (N.D. Ill. 2002). In

this case, the medical evidence of Plaintiff's obesity appears in the ALJ's opinion and is reflected in the ultimate RFC determination.

The ALJ's opinion notes that Plaintiff was diagnosed with obesity in January, 1999. (R. at 16.) The record reveals that obesity was included as an explicit diagnosis in medical assessments from April 30, 1998 to February 25, 1999. After February, 1999, obesity drops out of the medical assessments, though the same doctors were treating and examining Plaintiff and Plaintiff's weight remained largely unchanged. (R. at 289-303.) A consultative examining psychiatrist noted that Plaintiff was "somewhat obese," but this notation appears within the section of his report headed "Identifying Information." (R. at 220.) Plaintiff's treating physician, Dr. James Miller, does not mention obesity in any of the assessments he performed between July 13, 1999 and July 21, 2000. (R. at 289-99.) However, Dr. Miller did complete an IDPA report of incapacity on May 23, 2000, in which he opined that Plaintiff had an up to twenty percent reduced capacity to walk, but full capacity to sit and stand. (R. at 121.) Indeed, Plaintiff admitted that she has no difficulty walking, standing or sitting, so long as she is not suffering from a more severe headache. (R. at 37-38.) Plaintiff made no mention of obesity as a limitation on her ability to function. Thus, the ALJ's opinion refers to the only diagnosis of obesity available in the medical evidence.

Defendant argues that Plaintiff has not alleged any negative functional impact due to obesity; therefore, the ALJ was not required to assess obesity. (Def.'s Br. at 17.) While it is true that Plaintiff never raised obesity as a limitation, an adjudicator must consider all the relevant medical evidence of impairment. *See* 20 C.F.R. § 404.1523 (ALJ must consider the combined effect of all of the claimant's ailments regardless of whether such impairment would be

sufficiently severe if considered on its own); *Clifford*, 227 F.3d at 873. The medical evidence in this case provides evidence of obesity, the effect of which the ALJ was bound to consider.

The ALJ's ultimate RFC determination adequately takes into account any limitations Plaintiff's obesity may have imposed upon her ability to function. The ALJ was presented with a limited number of medical assessments that specifically listed obesity. In addition, the ALJ had before her the assessments of Plaintiff's treating physician, which did not mention obesity, as well as the same physician's belief that Plaintiff's ability to walk may have been reduced by up to twenty percent. The latter opinion, though not explicitly tied to obesity, provides some indication of the potential effect Plaintiff's obesity may have had on her mobility. Plaintiff's own testimony, however, would appear to undercut this conclusion, because she only tied decreased mobility to her headaches. Thus, the ALJ was presented with the fact of obesity, but only minimal accounts of what effect that condition exerted on Plaintiff's ability to function. The ALJ's determination that Plaintiff's RFC was limited to light unskilled work with the additional limitation of only being able to sit, stand or walk six hours in an eight hour workday (a twenty-five percent reduction) adequately accounts for the minimal limitations the medical evidence indicates Plaintiff's obesity may impose upon her functional capacity. (R. at 17-18.)

### 3. The ALJ Adequately Considered Plaintiff's Mental Limitations in the Ultimate RFC Determination.

Plaintiff argues that the ALJ failed to reduce Plaintiff's mental impairments to a mental RFC determination, and therefore the ultimate RFC determination was inaccurate. (Pl.'s Br. at 16.) Plaintiff's argument rests on the assertion that although a psychiatric consultative examination as well as a Psychiatric Review Technique had been completed, the ALJ should

have conducted a detailed review of the effect Plaintiff's impairments would have on her ability to function. (Id.) An ALJ, however, need not discuss every individual piece of evidence so long as she sufficiently articulates her assessment of the relevant evidence enough to assure the reviewing court that the important evidence was in fact considered. *Herron*, 19 F.3d at 333. We find that the ALJ adequately accounted for Plaintiff's mental impairments, considered the relevant medical evidence, and that the relevant medical evidence substantially supports the ALJ's ultimate RFC determination as well as the denial of benefits.

The ALJ's hypothetical presented to the VE restricted the individual to "simple routine tasks," and noted that the hypothetical was drawn from a physical RFC assessment performed March 30, 2000, and a mental RFC assessment performed March 23, 2000. (R. at 17; 232-39; 249-52.) The latter assessment, performed by Dr. Carl Hermsmeyer, Ph.D., indicated only two areas of moderate limitation: the ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. (R. at 249.) Dr. Hermsmeyer found all other areas of mental functioning not significantly limited. (R. at 249-50.) In the section of the assessment form that calls for narrative elaboration of the findings, Dr. Hermsmeyer noted that Plaintiff has a history of substance abuse disorder, amnestic disorder, NOS, and dysthymia. (R. at 251.) He concluded that Plaintiff possessed the mental capacity to perform simple tasks. (Id.) Thus, the ALJ's hypothetical as well as the ultimate RFC determination were built directly upon the mental RFC assessment of Dr. Hermsmeyer.

Dr. Hermsmeyer determined Plaintiff's mental RFC assessment because he noted that such an assessment was necessary on the Psychiatric Review Technique ("PRT") he completed on the same day, March 23, 2000. (R. at 240.) Thus, the mental RFC assessment

Dr. Hermsmeyer determined, and upon which the ALJ relied, necessarily incorporated the findings of the PRT. This conclusion is supported not only by the fact that the PRT lead directly to the mental RFC assessment, but also by the fact that the narrative elaboration of the mental RFC assessment lists the same disorders found in the PRT. (R. at 240-48; 251.) The PRT asserted that the mental RFC assessment was necessary because of indications of three possible categories of mental disorder: organic mental disorder (12.02), affective disorder (12.04), and substance addiction disorder "in remission" (12.09). (R. at 240; *see* 20 C.F.R. Part 404, subpart P, app. 1, §§ 12.02, 12.04, and 12.09 (2000).) As to organic mental disorder, Dr. Hermsmeyer checked "Absent" for all of the individually listed symptoms, but wrote in amnestic disorder, NOS, in the line provided for "Other" indications, and checked "Present." (R. at 242.) The section dedicated to section 12.04 (affective disorders) presents the exact same scenario, that is, all individual indications were checked as absent, and dysthymia was offered under "Other." (R. at 243.) As to section 12.09, substance addiction disorders, Dr. Hermsmeyer noted that the disorder was "in remission." (R. at 246.)

Dr. Hermsmeyer proceeded to rate the impairment severity of the disorders under the "B" criteria. (R. at 247; *see* 20 C.F.R. Part 404, subpart P, app. 1, §§ 12.02, 12.04.) He explicitly indicated that the ratings were made under the listing for substance addiction disorder in remission. (Id.) In addition, the form itself states that the listed "B criteria" are contained in the other listings, notably, 12.02 and 12.04. (Id.) The four "B criteria" are: restrictions of activities of daily living, difficulties in maintaining social functioning, difficulties of concentration, persistence or pace; and episodes of deterioration or decompensation in work or work-like settings. (Id.; 20 C.F.R. Part 404, subpart P, app. 1, §§ 12.02, 12.04.) Dr. Hermsmeyer found

slight limitation in the first three and insufficient evidence for the fourth. (Id.) Thus, none of Plaintiff's limitations met the requirements of a listing, and so Dr. Hermsmeyer performed a mental RFC assessment.

We find that the above facts deprive Plaintiff's arguments on these points of all force. Plaintiff's contention that the ALJ's RFC determination was erroneous because the ALJ failed to perform a separate mental RFC determination is rendered effectively meaningless by the fact that the ALJ explicitly relied upon and incorporated a recent mental RFC assessment performed by a consulting psychologist when crafting the hypothetical from which the ultimate RFC determination was derived. Plaintiff argues that the ALJ should have called a medical expert to the hearing to evaluate Plaintiff's mental RFC. There is simply no need, however, to call in an expert where an expert assessment already exists. We will not fault an ALJ for relying on the expert psychological assessment of a psychologist.

Plaintiff also asserts error based upon the perceived failure of the ALJ to analyze the severity of her mental impairments and their effect on her RFC under the listings. (Pl.'s Br. at 17.) In her Response Brief, Plaintiff expands this argument somewhat to assert that the ALJ failed to evaluate each impairment under its own listing, and that the ALJ's reference to the failure of Plaintiff to meet the "B criteria" (R. at 18), was inadequate because the ALJ did not break down this failure for each individual listing. (Pl.'s Resp. Br. at 3-4.) Once again, the ALJ's explicit reliance on Dr. Hermsmeyer's assessment obviates the need for the meticulous level of annotation Plaintiff would demand. *Herron*, 19 F.3d at 333 (so long as the reviewing court is able to trace the path of reasoning and is satisfied that the ALJ considered all the important medical evidence, then the articulation standard is met). Dr. Hermsmeyer evaluated the

"B criteria" that apply to all of the relevant listings and determined that no listing was met. (R. at 247.) Dr. Hermsmeyer then performed a mental RFC assessment to determine the effect the impairments had on Plaintiff's ability to function. He determined that Plaintiff possessed the mental capacity to perform simple tasks. (R. at 251.) In accordance with these findings, the ALJ determined that Plaintiff's mental impairments did not satisfy any listing and that she possessed the mental capacity to perform simple tasks. (R. at 17-18.) The ALJ referred explicitly to the mental RFC assessment performed by Dr. Hermsmeyer, (R. at 17), and also referred to the "B criteria" findings. (R. at 18.) The latter reference is instructive because the ALJ noted the same moderate limitations in the first three "B criteria" and no evidence of the fourth. (R. at 18.) Thus, the ALJ clearly accepted the findings of Dr. Hermsmeyer and relied upon them in her ultimate determination to deny benefits. Therefore, the ALJ established a logical bridge between relevant medical evidence and the ultimate determination.

As a final matter on this point, Plaintiff points to the ALJ's statement that the consultative psychiatrist's finding of amnestic disorder in February, 2000, was "not supported by his own clinical examination or any other objective evidence in the record." (R. at 18.) According to Plaintiff's argument, the statement "is clearly an incorrect interpretation of the medical evidence because the CE [consultative psychiatrist] included a separate paragraph in his assessment stating exactly why the diagnosis was amnestic disorder." (Pl.'s Br. at 17.) In addition, Plaintiff alleges that such a statement points to an ALJ "playing doctor." (Id.; *Rohan*, 98 F.3d at 970). Neither of these arguments are convincing given the ALJ's clear reliance upon Dr. Hermsmeyer's evaluations under the listings and mental RFC assessment. *See Rohan*, 98 F.3d at 970 (an ALJ's findings must be based on the testimony and medical evidence in the record).

F.3d at 970 (an ALJ's findings must be based on the testimony and medical evidence in the record).

The "separate paragraph" Plaintiff mentions lacks clear explanatory force. The entire paragraph reads, "The Amnestic Disorder is included as opposed to being poor concentration as part of his [sic] Dysthymic Disorder. I believe it is secondary to the chronic seizures." (R. at 222.) We read this simply as a note by Dr. David Gelhoff, the consulting psychiatrist, to explain why amnestic disorder was offered as a separate diagnosis rather than the relevant symptom of poor concentration being subsumed into the diagnosis of dysthymia. The doctor's reasoning is apparently based upon the opinion that Plaintiff's "chronic seizures" may be the cause of her poor concentration, rather than anything flowing from the dysthymia. The ALJ's decision to discount this opinion is based upon her reading of Dr. Gelhoff's report and the other objective evidence in the record. Unfortunately, the ALJ fails to offer what aspects of the record she relied upon, or what aspects of the report did not support this finding. (R. at 18.) This would appear to win the day for Plaintiff on this point. *See Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (ALJ need not discuss every piece of evidence, but must provide discernible logical bridge); *Herron*, 19 F.3d at 333 (ALJ may not select and discuss only the evidence favorable to her conclusion). However, we fail to see how the ALJ's rather artless dismissal of that diagnosis matters in the least given that amnestic disorder was explicitly examined in the medical reports upon which the ALJ did rely. Thus, regardless of her gnomic treatment of an equally gnomic diagnosis, that diagnosis figured into the assessments that formed the basis of her ultimate RFC determination anyway. In short, the ALJ did not substitute her own opinion, she simply relied on another doctor's assessment of Plaintiff's actual functional capacity. In addition, the assessment the ALJ

relied upon considered the effect of Plaintiff's amnestic disorder. Therefore, regardless of the dismissal of Dr. Gelhoff's diagnosis of amnestic disorder, NOS, amnestic disorder was still pulled into the ultimate RFC determination. The logical bridge is not lacking a necessary plank.

**B.    The ALJ Supported her Decision not to Credit Fully Plaintiff's Testimony with Relevant Medical Evidence from the Record.**

An ALJ's credibility determinations are granted a significant degree of deference. The credibility determination will not be disturbed unless it is patently wrong. *Luna v. Shalala*, 22 F.3d 687, 690-91 (7th Cir. 1994). This is due in large part to the fact that a credibility finding necessarily relies a great deal on intangible elements only evident to the judge at the hearing and not easily discernible from the transcripts. *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) (quoting *Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989)). Thus, an ALJ's credibility findings will be upheld so long as the judge provides specific reasons, which are supported in the record, for granting more or less weight to the claimant's statements. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); SSR 96-7p ("the determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record"). We find that the ALJ's finding that Plaintiff's complaints were not entirely credible meets this standard.

Plaintiff's testimony on the degree to which her physical and mental limitations affect her ability to function is significant because the VE stated at the hearing that if all of Plaintiff's statements were to be credited then she would be unemployable. (R. at 50-51.) The ALJ, however, determined that Plaintiff's statements were not entirely credible, and that certain of her admissions at the hearing supported the ultimate RFC determination. (R. at 18.) The ALJ found this to be the case in each area of Plaintiff's medical complaints: headaches, seizure disorder,

right upper extremity laceration, and mental limitations including depression. Each will be treated in turn.

The ALJ concluded that Plaintiff's claim that she suffers from constant and debilitating headaches was not supported by the record and was in fact belied by Plaintiff's own admissions. (R. at 18.) The ALJ noted that Plaintiff had never been to an emergency room for a headache and that there was no evidence that the medication prescribed for these headaches was not effective in controlling them. (Id.) Plaintiff stated at the hearing that her medication alleviated her headaches with the exception of "the real bad ones," for which "nothing helps." (R. at 35.) Plaintiff claimed that these headaches occurred once a week and could last from hours to days. (R. at 36.) The ALJ refused to credit this claim, because the record contained nothing to verify either the frequency or the severity of these headaches other than Plaintiff's own testimony. Indeed, the record contains no clear support for Plaintiff's claims. Plaintiff's own treating physician, who treated her headaches, noted no significant reduction in the ability to sit, stand or walk (R. at 121), and yet Plaintiff claimed at the hearing that her severe headaches prevented her from doing these activities at all, (R. at 37). We find that the lack of significant supporting objective evidence coupled with the fact that what evidence did exist tended to contradict Plaintiff's claims provided a sufficient reason for the ALJ to grant less credit to Plaintiff's statements concerning her headaches.

As to the seizures, the ALJ only notes that Plaintiff never visited an emergency room for this malady, and that the seizures only occur three to four times a year, and then only at night. (R. at 18.) The objective medical evidence and Plaintiff's own testimony indicate that the seizures are very rare occurrences, which have only occurred at night and during sleep. The

ALJ's emphasis on the infrequency of the seizures indicates a determination that they simply do not contribute enough to the overall medical picture to shift the ultimate RFC determination. Thus, the ALJ did not discredit the seizure complaints so much as determine that these complaints did not help bolster Plaintiff's characterization of her limited functioning because they occurred far too infrequently. We find this to be a reasonable conclusion that both the objective medical evidence as well as Plaintiff's testimony supports.

The ALJ determined that the limitations she placed upon Plaintiff's functional capacity due to that specific impairment were consistent with the medical findings of Drs. Gordon and Miller. (R. at 18.) The ALJ also asserted that Plaintiff's claim of constant and debilitating right hand pain is not supported by the objective medical evidence. (Id.) Dr. Gordon's determination that Plaintiff's grip strength in the right hand was 3/5 with some pain, and that Plaintiff could hold a can and a pen, and zip and button slowly, but with no notation as to pain, would appear to indicate that the pain in her right hand was triggered by the exertion of the grip strength test. (R. at 225.) More significantly, Plaintiff's own treating physician noted no real limitation in finger dexterity or fine manipulation, and indicated an ability to lift twenty pounds repeatedly during an eight hour day five days a week. (R. at 121.) These factors from the objective medical record alone are sufficient to support the ALJ's decision not to credit Plaintiff's claim of constant and debilitating pain in the right hand. In addition, these findings by Plaintiff's doctors contradict Plaintiff's statements at the hearing that she could not grab or hold things with her right hand. (R. at 38.) Thus, the objective medical evidence and the degree to which it contradicts Plaintiff's statements provide a sufficient basis for the ALJ's determination not to credit fully Plaintiff's claims concerning her right hand.

- 31 -

The ALJ also determined that Plaintiff's mental impairments did not limit her enough to render the performance of simple routine tasks impossible. (R. at 18.) In order to reach this conclusion, the ALJ refused to credit Plaintiff's claims that she was significantly limited in the activities of daily living, social activities, and concentration. Rather, the ALJ found Plaintiff to be only moderately limited in these areas. As indicated above, this specific finding is supported by the mental RFC assessment performed by Dr. Hermsmeyer. At the hearing, Plaintiff claimed that she could not go out alone because she gets confused too easily. (R. at 43.) In an Activities of Daily Living Questionnaire filled out August 28, 1998, Plaintiff claimed that she could go out alone, often paid her bills, and sometimes read, volunteered, watched television, and performed other common activities. (R. at 96-97.) Thus, Plaintiff's statements at the hearing describe a markedly deteriorated mental condition compared to what Plaintiff described two years earlier. This fact on its own, of course, indicates nothing divorced from the objective medical evidence. As discussed at length above, however, the medical evidence does in fact support the conclusion that Plaintiff can perform simple routine tasks. Presented with such a radical departure in Plaintiff's characterization of the effect her mental limitations had on her daily activities and ability to concentrate, it was appropriate for the ALJ to turn to the recent medical evidence to settle the difference. That evidence, discussed above, provides sufficient support for the ALJ's decision not to credit fully Plaintiff's claims of significant mental limitations.

Finally, the ALJ also noted in her credibility findings that Plaintiff suffers from depression and takes anti-depressants. (R. at 18.) More specifically, the ALJ pointed to the fact that Plaintiff had not sought psychiatric treatment for her depression until being referred a few weeks earlier by Dr. Desai, and that her first appointment would occur after the hearing. (Id.) Thus, Plaintiff's depression, though diagnosed and under treatment at least as early as April, 1998, (R. at 266), had not resulted in a referral to a psychiatrist until immediately before the hearing. Once again, the objective medical evidence simply does not offer a great deal of support to a conclusion that Plaintiff's depression was limiting enough to render her disabled. In addition, when asked why she had not sought out treatment for her depression, Plaintiff answered, "My doctor was giving me a depression medication. And, they have to refer you." (R. at 32.) Thus, Plaintiff herself conceded that she had not sought out psychiatric treatment because she was already receiving medication for her depression. This would appear to indicate that the medication had some effect. And indeed, Plaintiff also admitted that an earlier dosage of the medication helped, but that she now had to lower the dosage due to side effects. (R. at 32-33.) The ALJ followed this up with a question to confirm that she would be visiting a psychiatrist soon. (R. at 33.) Thus, there was ample reason to believe that Plaintiff's depression medication had helped in the past, and would continue to help in the future. The ALJ's decision not to credit fully Plaintiff's claims about the effect of her depression on her ability to function is supported by sufficient evidence in the record.

## V.    Conclusion

For the above reasons, the Court affirms the Commissioner's final decision.  The

Commissioner's motion for summary judgment is therefore granted, and Plaintiff's motion for

summary judgment is denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated:  March 22, 2004.

Copies have been mailed to:

FREDERICK J. DALEY, JR., Esq.          KATHRYN A. BEVERLY, Esq.
MARK D. DeBOFSKY, Esq.                 Special Assistant United States Attorney
Daley, DeBofsky & Bryant               200 West Adams Street
One North LaSalle Street               30th Floor
Suite 3800                             Chicago, IL  60606
Chicago, IL  60602

Attorneys for Plaintiff                Attorneys for Defendant